[Civ. No. 7756.  Second Appellate District, Division Two.—April 14, 1933.]

ANNA MILLER, Respondent, v. SECURITY INSURANCE COMPANY OF NEW HAVEN, CONNECTICUT (a Corporation), Appellant.

Hindman & Davis for Appellant.

Craig & Weller, W. W. Wallace and Thomas S. Tobin for Respondent.

WORKS, P. J.—This is an action to recover on a policy of fire insurance. Plaintiff had judgment and defendant appeals.

The action resulted from a fire in which several buildings, the property of respondent, were destroyed. This group of structures was located at Elizabeth Lake, not far from the highway known as the Ridge Route, in the county of Los Angeles. Harvey Eshelman, the fire warden in charge in the district, and Robert Reep, one of his men, testified that when they arrived on the scene there were two separate, or ''non-communicable'' fires burning in the group. A building known as the tavern and a garage adjacent to it were burning briskly, while inside a dance-hall, a structure somewhat removed from the other two, a blaze was evident. All the testimony in the record shows that the doors and windows of the dance-hall were closed at the time. Eshelman and Reep said the roof and outside of the dance-hall were not burning. Eshelman testified also that a part of the inside walls and floor of the latter building were wet from the sprinkling of some petroleum product which smelled like kerosene. The evidence shows also that some

years before the fire at Elizabeth Lake respondent had been paid $4,000 by an insurance company for a fire loss at Redlands, although no further particulars of this occurrence appear in the record. The chief of the fire department of Monrovia testified that a fire had occurred at the home of respondent and her husband in that city in 1921 and that it was extinguished before great damage had been done. He swore that a line of kerosene had been sprinkled through three rooms of the house and that the fire had run and burned the floor along this line in all three rooms. Respondent did not testify that she had not sprinkled kerosene in the dance-hall at Elizabeth Lake, nor did she dispute the story of the Monrovia fire chief. In addition to these circumstances, Eshelman testified concerning two somewhat damaging conversations between him and respondent. These she did not deny.

Despite these strong circumstances the trial judge found that respondent did not burn, or cause to be burned, the single building covered by the insurance policy involved in the present action, which building was the tavern. Without going further into the matter, we state, for the benefit of counsel, that the testimony of Eshelman and Reep was, we think, substantially disputed in part by each of the witnesses named below, whose testimony we have read in full, as well as that of Eshelman and Reep. We list the witnesses as their names appear in succession in the transcript of the record: Beatrice Smith, Ray Seiger, Mary Nollenberger, Charles A. Downing, Gerson Seiger, Donald M. Thomson, Frank Frakes and F. J. Talmantes. Most of these witnesses disputed Eshelman and Reep in particulars not mentioned above, but we think the testimony of all of them taken together was sufficient to support the finding of the trial court which is now in question.

The policy covering the tavern was dated March 19, 1927. The document recited that the property was insured "while occupied for hospital and/or sanitarium purposes". On July 7th of the same year a rider was attached to the instrument which read that "permission is hereby granted to the assured to use the within described property for lodging and boarding purposes, as well as hospital and/or sanitarium". The policy contained the usual provision: "This entire policy shall be void if the insured has concealed

or misrepresented any material fact or circumstances concerning the insurance or the subject thereof.'' The answer alleged that at the time the policy was executed respondent fraudulently concealed certain material matters hereafter to be mentioned. It was also alleged that at the time the rider was attached to the policy she fraudulently concealed certain matters material thereto. The trial court found against appellant under each of these allegations and it is contended that the findings were not supported by the evidence. The two findings will be considered together, as they present the same legal question.

Respondent having made application to the authorities for leave to use the tavern as a sanitarium, Robert L. Dunlap, fire prevention engineer for the county, visited the place on November 21, 1926, for the purpose of inspecting it. This visit and inspection were made at the request of the public welfare commission. Dunlap testified that the tavern was a ''two story frame building, doors opening in. . . . Lighted by what is known as a Coleman gasoline light, under pressure, and small tubing which leaked in many places. Insufficient exits from the second floor. Surrounding exposures very close to the main structure.'' He also testified that these conditions ''would disqualify this building and prevent it from being used for a sanitarium and hospital purposes''. He told respondent, as he said, ''that I would not approve of the building to be used for that purpose, and that she would receive a written report within a few days''. Dunlap again visited the tavern on January 17, 1927, in company with another man, but then made only what he called a reinspection. He was there again on May 24th with ''Mr. Mott of the State Housing Commission'', and testified that he found no ''changes sufficient to qualify'' the house for use as a sanitarium. He visited the place again on July 13th, when Mrs. Florence Edwards, housing inspector for the county health department, was with him. He testified as to what he found on that occasion: ''There had been an emergency stairway provided from a rear bedroom window on the second floor along the porch where steps led to the ground. That was the only change of any material difference.'' The fire occurred on July 21st of the year of the January, May and July 13th visits, that is, the year 1927.

On the visit of May 24th, when Mr. Mott was with him, Dunlap first inspected the tavern with a view to ascertaining its availability for lodging and boarding purposes. He testified that after the inspection of that date, speaking to respondent: "I said we would not at any time permit that building in its present condition to be used for a sanitarium, hospital, hotel or other place of public assemblage." On the visit of July 13th, eight days before the fire, after making his inspection, he testified he told "both Mr. and Mrs. Miller . . . substantially the same as I have said before". He then went on: "They were very much put out and were quite—I will put it, mad, and sort of resented both or all of the suggestions that I had made, and, in turn, in the presence of Mrs. Edwards, Mr. Miller stated that he was sick and tired of the whole mess, and that he was going to get his money out of the place some way."

There is other testimony as to the unfit condition of the tavern from the latter part of December, 1926, until immediately after May 20, 1927, that of Alice Laib and Dr. F. B. Brockett. These two held the tavern under lease from respondent between the two dates, having taken it for the purpose of operating a sanitarium. They finally surrendered possession because a permit could not be obtained to employ the property for their intended uses, and the Millers at once reoccupied the place. It is not necessary further to refer to specific testimony of Mrs. Laib and Dr. Brockett. It is enough to say that from November 21, 1926, forward, no permit was ever issued by the public authorities for the use of the tavern either as a sanitarium or for lodging and boarding purposes. Moreover, respondent knew before she procured the policy in question that the property could not be used as a sanitarium; she knew before the rider was attached to it that the house could not be used as a hotel—for "lodging and boarding purposes", as the rider expressed it—without radical changes in the structure. These changes were never made.

From before March 19, 1927, the date of the policy, to the day of the fire, respondent was under a continuing duty to inform appellant that the tavern could not be employed as a sanitarium. From May 24, 1927, to the date of the fire she was under a continuing duty to inform the company that the property could not be used as a hotel. In with-

holding this information we think she practiced a fraudulent concealment upon appellant. Can it be logically believed that appellant, if it had known the true conditions at the respective dates, would have issued the policy, or would have attached the rider to it? And this is a very material consideration in discussing the question presented (Civ. Code, secs. 2561, 2563, 2565; *General Acc. etc. Corp.* v. *Industrial Acc. Com.,* 196 Cal. 179 [237 Pac. 33]; *Solomon* v. *Federal Ins. Co.,* 176 Cal. 133 [167 Pac. 859]). Appellant very justly says in its brief: "The character of the business or occupation to be carried on in the building to be insured is, of course, the most material part of the contract, and as the policy allowed her to carry on only certain business in the building insured, and as she was prohibited from doing so, and knew that she was, it would seem hardly necessary to say that her failure to communicate this to the insurance company was a concealment of material facts and would void the policy."

In dealing with this question of concealment respondent quotes thus from the policy: "Vacancy. Permission is hereby granted for the within described building to be or remain vacant or unoccupied without limit of time." The only argument advanced in support of the proposition that the vacancy clause can affect this question as to concealment is contained in the following statement in the brief: "That the hazard or risk was greater with the building vacant than occupied for lodging and/or boarding purposes was admitted by the special agent for the insurance company." We fail to see what this testimony can have to do with the question. The real point is this: If, before the rider was attached to the policy, respondent was not limited to a use of the tavern *when occupied,* as a sanitarium, or if, after the rider was attached, she was not limited to its use *when occupied,* as either a sanitarium or a hotel, then at any time after the issuance of the policy so far as its validity against appellant is concerned, she could have used it for any purpose she pleased. She could have turned it into a manufactory for the purpose of making powder or fireworks. As appellant says, she could have used it as a bootlegging headquarters or as a bawdy-house. To return more directly to the vacancy clause: The tavern was never vacant, but, although always occupied, it was never used as allowed by

the policy, either as it originally stood or as modified by the rider. While Mrs. Laib and Dr. Brockett occupied the house they had two boarders for a very short time—one was there less than a week, the other two weeks—but never a patient. The Millers never used the tavern as either a hotel or a sanitarium. The only persons ever in the house, besides themselves, were friends who visited them. The material point, however, is that the house never could have been used lawfully as either a sanitarium or a hotel, and that this state of affairs was concealed from appellant. The two findings now under consideration were without support in the evidence.

■ The trial court found that the tavern, "on the date and at the time of the fire . . . was being used for lodging and boarding purposes in accordance with the terms" of the policy. It is contended that this finding was unsupported by the evidence, and the contention must be upheld. At the time of the fire the building, which consisted of fifteen rooms, was occupied only by respondent and by a young woman named Ray Seiger. They evidently occupied the same room, as Miss Seiger testified that on the night of the fire they had retired to rest in the same bed. Moreover, the young woman said that she was visiting the respondent, whom she had known about seven years, at the time. She was there to recuperate after an operation for appendicitis. It is plain from the entire testimony of Miss Seiger that she was not a boarder at the house. From a remark in respondent's brief it appears that counsel's theory is that any house in which people eat and sleep is being used for "lodging and boarding purposes", and the trial judge, from two observations made by him at the trial, seemed to entertain a similar view. At any rate, the trial judge said specifically in these observations that to use a building for "lodging and boarding purposes" was very different from using it as a lodging and boarding house. The finding of the court was probably based on this erroneous view. We think the rider attached to the insurance policy was intended to allow the use of the tavern as a lodging and boarding house, or as its equivalent, a hotel. Certainly, the mere presence of respondent and her personal guest, who was there without the payment of board or lodging, could not make the building a hotel. All this is aside from the fact that, as we have

already shown, respondent could not lawfully have operated a hotel at the place on the day of the fire. Appellant cites in its brief various legal definitions of the terms "boarding" and "lodging", but the meaning of the words is so generally understood that it is unnecessary to cite the authorities here.

Appellant makes other points but it is useless to discuss them.

Judgment reversed.

Craig, J., and Stephens, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on May 12, 1933, and an application by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 12, 1933.